**FILED**

**JUL 1 4 2016**

Clerk, U S District Court
District Of Montana
Missoula

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

NATIVE ECOSYSTEMS COUNCIL,
*et al.*,

      Plaintiffs,

vs.

LEANNE MARTEN, *et al.*,

      Federal Defendants.

CV 15–98–M–DLC

ORDER

Before the Court are the parties' cross-motions for summary judgment and

Plaintiffs' motion for a preliminary injunction. The State of Montana has filed an

amicus brief in support of Defendants' motion,[1] as have, collectively, Watershed

Restoration Coalition, Rocky Mountain Elk Foundation, National Wildlife

Federation, and Sun Mountain Lumber, Inc.[2] Upon review of the papers submitted

and the administrative record, the Court has determined that the matter is fit for

---

[1] The State of Montana's brief focuses primarily on Plaintiffs' unwillingness to participate meaningfully in the administrative process. While there may be merit to amicus's argument that the parties' energy would be better spent improving the project prior to finalization than litigating it afterward, the Court finds that Plaintiffs did not waive their arguments and reaches Plaintiffs' substantive claims.

[2] Amici similarly highlight Plaintiffs' refusal to involve themselves in the administrative process. Otherwise, their arguments track those of the Defendants.

disposition without oral argument and that summary judgment for Defendants is appropriate. Because the Court now grants summary judgment, Plaintiffs' motion for a preliminary injunction is denied as moot.

## BACKGROUND

Plaintiffs filed suit in this matter on July 30, 2015, challenging the Beaverhead-Deerlodge Revised Land and Resource Management Plan ("Forest Plan") and the East Deerlodge Valley Landscape Restoration Management Project ("Project") on the Beaverhead-Deerlodge National Forest ("Forest"). Plaintiffs seek judicial review of United States Forest Service ("USFS") and United States Fish and Wildlife Service ("FWS") actions under the Administrative Procedure Act ("APA"). Plaintiffs dispute USFS's and FWS's compliance with the Endangered Species Act ("EPA"), the National Forest Management Act ("NFMA"), and the National Environmental Policy Act ("NEPA").

The Project authorizes 502 acres of commercial thinning and 2,541 acres of commercial logging within 39,651 acres of the East Deerlodge Management Area in the Beaverhead-Deerlodge National Forest. (FS 002897, 002900.) The primary purpose of the Project is to salvage lodgepole pine. Stands of lodgepole pine trees within the Project area have been devastated by the mountain pine beetle epidemic in recent years. (FS 002503.) As a result, the vast majority of the lodgepole pine

-2-

trees in the Project area are dead. Many of the trees have fallen, and those that have not are at risk of doing so within the next fifteen years. (FS 002504, 002435.) Without intervention, the forest floor will be covered with combustible material, and new growth will be delayed. (FS 002457, 002478.)

In authorizing the Project, USFS addresses the following activities and goals beyond the salvage of lodgepole pine. Small-diameter Douglas fir are to be thinned in approximately 500 acres. Encroaching conifers will be removed from the edges of parks, meadows, and aspen stands. The Project intends to protect riparian habitat with the construction of worm fencing to prevent livestock grazing near streams and construction or repair of 12 culverts that prevent fish passage. The Project authorizes construction of 11.2 miles of temporary roads, but by the time of project completion, approximately 22 miles of authorized and unauthorized motorized roads and trails will be decommissioned or closed.

USFS considered three alternatives before determining the scope of the Project. The first was to do nothing at all. The second alternative met the goals and objectives set forth in the Forest Plan for timber management, vegetation, aquatic resources, and wildlife habitat, but USFS found it to be less ideal than the

third alternative, which also met all goals. (FS 02919–20.[3]) The third alternative was chosen based on "several key elements including consistency with project purpose and need, consideration of environmental and social impacts, and responsiveness to the objections raised during the objection process . . . ." (FS 002918.) The selected alternative was modified during the decision-making process, primarily to improve outcomes for soils and wildlife—particularly the Northern Rockies Lynx—within the Project area. (FS 002922–24.) USFS determined that the modified selected alternative, as compared to the other alternatives, would be equal or better for vegetation within the Project area and preferable in terms of timber management, aquatic resources, and wildlife habitat. (FS 002920.)

The Project area is currently heavily used by the public. Road density is high, at 2.4 miles per square mile. Upon Project completion, road density will decrease to 2.2 miles per square mile. The area has traditionally been and remains open to livestock grazing. It has been and will continue to be used by snowmobilers, hunters, and miners. It is also open for firewood cutting and recreation. USFS has historically used noxious weed treatments and insecticides

---

[3] Citations to the record consist of two components: (1) a reference to the administrative record (e.g., "FS" for documents from the USFS administrative record or "FWS" for those from the FWS record); and (2) the six-digit page number within the relevant record.

within the area, and these treatments are expected to continue in the future. (FS 002518.)

If the Project area were not so heavily used by the public, it would likely be a suitable habitat for grizzly bears. (FS 017393.) USFS determined that grizzly bears "may be present" within the Project area. (FS 017394.) Analyzing the current Project area conditions alongside the likely effects of the Project, USFS found the Project "may affect and is likely to adversely affect" the grizzly bear. (*Id.*) The same paragraph clarifies that the adverse effect is due to pre-Project conditions: "[e]ven though the project as designed will decrease open motorized roads and trails in the action area, will minimize disturbance to grizzly bears by following travel restrictions and implementing food storage requirements; due to the current high road density, and high level of human use throughout the action area, the current condition of the action area may displace grizzly bears from this area that they may have used otherwise." (*Id.*) USFS determined that the Project itself would "not contribute to significant cumulative effects to the grizzly bear" because use of the area by grizzlies "is suspected to be low," the Project area is outside of the NCDE Recovery Zone, the Project will be short-lived, and the Project will decrease motorized roads and trails—the factor most significantly impacting the suitability of the forest as a habitat for the grizzly. (*Id.*)

As a result of USFS's finding of a potential adverse effect upon the grizzly bear, it initiated a consultation with FWS. FWS used its 2013 biological opinion and incidental take statement regarding the effects of the Forest Plan on the grizzly bear as a baseline, which Defendants describe as the first tier of a tiered consultation regarding the Project. (FS 017433–34, 014789–910.) FWS set two surrogate measures of incidental take: (1) existing access management; and (2) construction of new temporary and permanent roads. The biological opinion weighs the likelihood of temporary road construction for specific projects on the Forest, determining that, while roads adversely affect the grizzly bear, implementation of the Forest Plan—which authorizes construction of 70 total miles of temporary road—will not threaten the grizzly. (FS 017433–34.) Because the Project—the first project under the Forest Plan—authorized construction of 11.2 miles of temporary roads, well within the 70 miles FWS evaluated in its biological opinion, FWS determined that it did not need to issue additional biological opinions regarding the Project itself.

Nonetheless, the FWS sent two consultation letters regarding the Project, repeating the sufficiency of the biological opinion and clarifying that the Project did not present new threats to the grizzly bear. In 2014, FWS wrote that the "project does not have additional adverse effects to grizzly bear" beyond those

fully analyzed within the Forest Plan biological opinion. (FS 017434.) One year later, it advised USFS that the Project "is not likely to jeopardize the continued existence of grizzly bears." (FS 017439.) While FWS also found that some aspects of the Project "may result in short-term disturbance to grizzly bears in the immediate vicinity of the units due to increase in human presence," it informed USFS that effects from such disturbances would be "insignificant" because of the proximity of secure habitat within the action area. (FS 17439.)

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the documentary evidence produced permits only one conclusion, summary judgment is warranted. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 251 (1986). To preclude entry of summary judgment, any existing factual dispute must be material, as factual disputes that are irrelevant or unnecessary to the outcome of the matter will not be considered. *Id.* at 248. "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether an agency could reasonably have found the facts as it did" based upon the "evidence in the administrative record." *City &*

*Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (citations omitted).

## II.    Administrative Procedure Act

Courts review claims regarding the ESA, NFMA, and NEPA under the APA. 5 U.S.C. §§ 701–706; *See, e.g., Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Under the APA, a "reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The Court's scope of review is narrow; it must "not substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A decision is arbitrary and capricious

> only if the agency relied on factors Congress did not intend it to
> consider, entirely failed to consider an important aspect of the
> problem, or offered an explanation that runs counter to the evidence
> before the agency or is so implausible that it could not be ascribed to
> a difference in view or the product of agency expertise.

*Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1224 (9th Cir. 2011).

An agency's actions are valid if it "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (citations and internal quotation marks omitted). If the record supports the

-8-

agency's decision, that decision should be upheld even if the record could support alternative findings. *Arkansas v. Oklahoma*, 503 U.S. 91, 112–13 (1992). Review of the agency's action is "highly deferential, presuming the agency action to be valid." *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010).

However, courts must not "rubber stamp" administrative decisions "they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco, & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 97 (1983) (citations and internal quotation marks omitted). Judicial review under the APA is "narrow but searching and careful," and courts need not uphold agency actions where "there has been a clear error of judgment." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004) (citations and internal quotation marks omitted).

## ANALYSIS

### I.    Compliance with the ESA

Plaintiffs allege that the Forest Plan and the Project present threats to the grizzly bear, a species classified as threatened under the ESA. Plaintiffs claim that FWS and USFS failed to use the best available science in their ESA consultations on grizzly bears in the area. They argue that both the Project and the Forest Plan

consultations fail to consider appropriate scientific findings regarding road density and secure habitat requirements for Northern Continental Divide Ecosystem ("NCDE") grizzly bears. Defendants claim that they applied the best available science and, further, that the Project will decrease road density and that the NCDE requirements do not apply in the Forest, which is outside the NCDE recovery zone.

Federal agencies must use the "best scientific and commercial data available" in ESA consultations. 16 U.S.C. § 1536(a)(2). Because agencies are better situated than the court to determines what is the "best available science," they are entitled to substantial deference in making that determination. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 621 (9th Cir. 2014). However, the ESA exists to improve outcomes for protected species, and so agencies must honor Congress's intent to "give the benefit of the doubt to the species." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988).

## A. The Forest Plan

Plaintiffs argue that the Forest Plan violates the ESA because the Forest Plan consultation does not use the best available science and because FWS failed to support its surrogate measures of incidental take. The Court considers each theory in turn.

Plaintiffs allege that, during the Forest Plan consultation process, the agencies failed to use the best available science regarding road density and habitat for Northern Continental Divide Ecosystem grizzlies. Plaintiffs cite to five publications in support of their claims that grizzly bears require fewer roads and more secure habitat than that provided for by the Forest Plan. Defendants assert that these five publications were indeed considered by FWS in preparing its biological opinion but that the specific recommendations found within each publication are not controlling with regard to the Forest Plan.

The parties do not dispute that roads adversely impact grizzly bears. Under the Forest Plan, road density will decrease slightly from its current level and that allowed under the previous forest plan. Defendants claim that the Forest Plan's allowances are lawful. Plaintiffs argue that the density will remain too high to comply with the ESA.

The parties likewise agree that more secure habitat within the Forest would benefit the grizzlies. As with road density, implementation of the Forest Plan will result in a Forest slightly more hospitable to grizzly bears in terms of secure habitat. Again, the dispute between the parties is whether the agencies have an affirmative obligation to create an ideal forest for the grizzly bear.

The parties do not dispute that the 2013 draft Northern Continental Divide

Ecosystem ("NCDE") Grizzly Bear Conservation Strategy ("Strategy") presents the best available science regarding preservation of NCDE grizzly populations. However, they argue its relevance to the Forest Plan.

USFS appropriately consulted the Strategy, which does not require the agency to set specific goals within the Forest. The NCDE draft Strategy "describe[s] the coordinated management and monitoring efforts necessary to maintain a recovered grizzly bear population in the NCDE and document[s] the commitment of . . . agencies to this shared goal." (FWS 007300.) The Strategy outlines different regions for which different recommendations are made. In the NCDE recovery zone, the Strategy recommends road density considerably lower and secure habitat considerably higher than those set forth as goals in the Forest Plan. However, these goals apply only within the NCDE recovery zone. Part of the Forest is within the NCDE, but it is not within the recovery zone. Rather, it is within "Zone 2," for which the Strategy recommends: "because we know that management direction . . . in Zone 2 did not preclude male grizzly bears from occupying this area in low densities, existing direction will continue to apply." (FWS 007397.)

Thus, although it was appropriate for USFS to consider the Strategy's recovery zone recommendations, which it did with clear reservations about their

-12-

applicability, those recommendations do not apply within the Forest. USFS was free to set different goals for road density and secure habitat in the Forest Plan. Plaintiffs have not met their burden of showing that the Forest Plan violates the ESA's best available science requirement by not implementing the Strategy's recovery zone recommendation.

Plaintiffs also argue that the Plan violates the ESA because FWS failed to adequately support its surrogate measures of incidental take. FWS applied two surrogates: the existing levels of access management and anticipated temporary road conditions. The first surrogate allows permanent open road density at 1.9 miles/square mile within the Project area. The second allows 70 miles of temporary roads to assist with implementation of the Forest Plan. Plaintiffs claim that FWS should have used the recovery zone recommendations from the Strategy, described above, as a surrogate measure. As explained above, the Forest is not within the recovery zone, and this argument fails.

Plaintiffs also argue that FWS did not adequately support its surrogate measures with scientific data. The ESA does not require an agency to use a specific process in setting surrogate measures. Rather, the agency fulfills its requirements when it "base[s] its decision on the best available scientific data and [grounds] its decision in a consideration of the relevant factors." *Greenpeace*

*Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992).

FWS met the ESA's requirements in supporting its surrogate measures of incidental take. It reasonably determined that the Forest Plan would not harm the grizzly bear when it requires a reduction in road density and an increase in secure habitat over time. In reaching that conclusion, FWS considered the best available science, including the same studies Plaintiffs champion. In fact, Plaintiffs' argument is largely that there are too many roads in the Forest. If anything, then, the parties generally agree about basing the surrogate measures of incidental take on current and future road density. And one might expect them to agree that a temporary increase in road density leading to a permanent decrease would benefit the grizzly bear.

Plaintiffs have not met their burden of showing that the Forest Plan violates federal law. The record unambiguously supports USFS's conclusion that the Forest Plan and the Project will benefit the grizzly bear, even if it will not create ideal conditions for the species. It cannot be argued that both the road density and the amount of secure habitat within the Forest limit its suitability for grizzly bears. However, the ESA does not mandate that USFS transform the Forest's recreational areas into grizzly habitat.

Plaintiffs' argument is not that the Forest Plan moves in the wrong direction

but that it does not move far enough. The Court cannot agree, because to agree would be to overreach. This Court cannot tell the agency, which is better situated to evaluate and implement scientific data, exactly how to perform a task delegated to it by Congress. Plaintiffs have not met their burden of showing agency error, and the Court finds no violation of the ESA.

### B.    The Project

Plaintiffs' arguments regarding the Project itself mirror those claiming error in the Forest Plan. They assert that the Project biological assessment unlawfully fails to disclose scientific sources supporting USFS's conclusion that sufficient secure habitat exists within the Project area. Further, they claim that FWS failed to use the best available science in its consultation letters regarding the Project's impact on the grizzly bear. Ultimately, although the Project will result in a net increase in secure habitat and a net decrease in road density, Plaintiffs argue that the Project will not create a sufficient amount of secure habitat or decommission a sufficient number of roads.

Plaintiffs advocate for specific goals for secure habitat and road density within the Project area—the same goals, described above, outlined for the NCDE recovery zone. The Court cannot substitute its judgment for that of USFS. The agency appropriately considered the best available science and made reasonable

standards and objectives for the Forest based upon that science. Thus, the question is not whether Plaintiffs have presented better goals for the Project. Rather, the only remaining issue is whether the Project consultation complies with the ESA's procedural requirements.

Under the ESA, USFS's finding that the Project "may affect" the grizzly necessitated its consultation with FWS. 50 C.F.R. §§ 402.14(a). Because USFS determined that the Project is "likely to adversely affect" the grizzly bear, the ESA required USFS and FWS to engage in a formal consultation. 50 C.F.R. §§ 402.13(a), 402.14(a)–(b). To meet the ESA's requirements, FWS was required to review the action and evaluate its impact on the grizzly bear with a "biological opinion" supporting its findings. *Id.*; 50 C.F.R. § 402.14(g). However, FWS need not "reinvent the wheel for every [biological opinion]." *Gifford Pinchot Task Force v. FWS*, 378 F.3d 1059, 1068 (9th Cir. 2004). Rather, the biological opinion is a piece of the consultation process, and it may "permissibly rely, in part, on the projections and assumptions of the [Forest Plan.]" *Id.*

The agencies' Project consultation meets the ESA's requirements. In the Project biological assessment, USFS found that "the current condition of the action area may displace grizzly bears from [the Project] area that they may have used otherwise." (FS 017394.) For that reason, it initiated the consultation

process with FWS, which determined that, while the Project may result in short-term disturbances to the grizzly bear, it would ultimately have no adverse effect. Taken together, the consultation letters and the biological opinion make clear that FWS fully considered the impact of the Forest Plan and the Project and reasonably found that the Project would not threaten the species.

The Project is consistent with the Forest Plan, which itself complies with the ESA. It is clear from both the Project biological assessment and the consultation documents that any potential adverse effect to the grizzly bear within the Project area is attributable not to the Project itself but to the continued use of the Project area as a recreational site. The Project will decommission significantly more roads than it builds within the Project area. The lower road density will create more secure habitat. Plaintiffs cannot isolate the words "likely to adversely affect" from their context, which makes clear that any harm to the grizzly bear is preexisting and that any temporary disturbance to a possible grizzly bear population will ultimately lead to a more hospitable forest. The Court cannot tell USFS and FWS exactly how to protect the grizzly bear. Defendants are entitled summary judgment on Plaintiffs' ESA claim.

## II.    The Forest Plan Snag Standard

Plaintiffs next argue that they are entitled to summary judgment because the

Forest Plan's snag standard violates NFMA. Plaintiffs raise two arguments in support of this claim: (1) that the size of the analysis area for Forest Plan snag standard application is arbitrary and capricious, and (2) that the snag standard does not adequately ensure the viability of cavity nesting species. The Court addresses each in turn.

NFMA requires USFS to enact forest planning regulations that "provide for diversity of" wildlife. 16 U.S.C. § 1604(g)(3)(B). To meet NFMA's requirements, USFS regulations mandate that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19 (2000). Under NFMA, the Forest Plan must comply with USFS regulations regarding species viability, and the Forest Plan Environmental Impact Statement ("EIS") sets forth the Forest's intent to do so. (*See* FS 017655.)

The parties do not dispute the importance of dead and dying trees as a habitat for cavity-nesting species. In order to ensure the continued viability of these species, the Forest Plan sets standards for snag retention. Under the Forest Plan, all snags greater than 20" diameter at breast height must be retained unless they present a hazard. (FS 017692.) Snags greater than 15" must be retained at varying numbers per acre dependent upon the vegetation category. (*Id.*) Where

-18-

there are insufficient live trees or snags greater than 15", the Plan requires that all trees greater than 15" be retained. (*Id.*) The Plan also requires retention of specified numbers of live trees greater than 10" to provide for future snags within designated areas. (FS 017692–93.)

Plaintiffs argue that Defendants set an arbitrary and capricious area for application of the snag standard. More specifically, Plaintiffs claim that the snag standard should be averaged over smaller land areas. Defendants assert that a larger application area allows for a clumpy rather than an even distribution of snags, which is supported by the best available science.

Plaintiffs claim that snag densities should be averaged over a 5–25 acre analysis unit, rather than over the entire Project area. In support, they cite to *Oregon Natural Resources Council v. Brong.* 492 F.3d 1120 (9th Cir. 2007.) In *Brong*, the Bureau of Land Management ("BLM") averaged snag density over an entire project area. The Ninth Circuit determined that the BLM's method of averaging was inconsistent with the relevant land management plan, as well as "grossly misleading" because it authorized the logging of two-thirds of the project area without any snag retention. *Id.* at 1129–30.

In response, Defendants argue that USFS based its snag standard on the best available science. They point to USFS's reliance upon Bollenbacher, *et al.*, 2008

("Bollenbacher"). Bollenbacher sets forth specific recommendations for snag densities within the Forest, which vary according to forest vegetative conditions. (FS 019284.) The analysis recommends clumpy distributions of snags to match the conditions under which the species evolved. (FS 019287, 020719.) In fact, Bollenbacher specifically expresses that analyzing snag density over a large amount of acreage is preferable for ensuring the continued viability of cavity-nesting species within the Forest: the recommended snag standards "do not need to be applied to every acre within a treatment area, but should be the average density of snags within the total treatment unit acreage or even the entire project area." (FS 020735.)

The Forest Plan snag standard is consistent with Bollenbacher, upon which USFS reasonably relied. The snag standard complies with NFMA because it is neither arbitrary nor capricious. USFS seeks to restore and maintain the natural and ideal clumpy distribution of snags that allowed for the evolution of the species. To meet this goal, the Forest Plan allows snag standards to be averaged over units or project areas, just as Bollenbacher recommends. (FS 017692, 019285–87.) Plaintiffs' claim that USFS had "no scientific basis" for its snag standard is not supportable. Pl.'s Br. 18.

Nor does Plaintiffs' citation to case law sufficiently support their argument.

-20-

*Brong* does not apply here, as that case involved a snag standard that was inconsistent with the land management plan. 492 F.3d at 1130. Here, the Project applies the same standard as the Forest Plan, which itself complies with NFMA. Additionally, the Project requires retention of all live trees and snags greater than 15", preventing the sort of statistical manipulation made possible in *Brong*.

Plaintiffs also argue that the snag standard fails to adequately ensure the viability of cavity-nesting species. They claim that, although the Forest Plan standard preserves all snags greater than 20" diameter and a set number greater than 15", an appropriate standard would also conserve some snags between 10" and 15". Defendants disagree that USFS had any obligation to set specific retention standards for smaller diameter snags, and they further counter that both the Forest Plan and the Project demonstrate the agency's dedication to preserving the viability of cavity-nesting species in the Forest and the Project area.

The Forest Plan does not set a standard for snags between 10" and 15" because USFS determined that implementation of the Forest Plan would preserve a wealth of snags within this category. Looking to relevant scientific publications, USFS determined that smaller diameter snags, abundant throughout the Forest, are unthreatened by the actions anticipated in the Forest Plan. (FS 019285.) USFS also found that, because of the high rates of death due to beetle infestation and

-21-

wildfire, there would be no shortage of smaller diameter snags into the future. (*Id.*) Additionally, USFS demonstrated a strong commitment to consideration of cavity-nesting species in the Forest Plan EIS, a dedication reflected in USFS's revisions to the draft EIS. (*See* FS 019277, 019287, 019291.) The Court disagrees that USFS had any obligation to set a specific Forest standard for retention of small-diameter snags when the agency determined that there was no need for such a standard after carefully considering the scientific data.

Plaintiffs have not met their burden of showing that the snag standard is arbitrary or capricious or that it violates NFMA by presenting a threat to the continued viability of cavity-nesting species. Defendants are entitled to summary judgment on Plaintiffs' claims regarding the snag standard.

## III. Compliance with NEPA and NFMA

Plaintiffs argue that the Project violates NFMA and NEPA because the Project EIS does not comply with Forest Plan riparian conservation and management standards or with a Forest Plan standard requiring USFS to close all unauthorized motor vehicle routes. Defendants raise two defenses, arguing: (1) that Plaintiffs cannot argue that the Project fails to meet the Forest Plan's riparian standards because they failed to raise these concerns during the administrative process; and (2) that Plaintiffs' claims also fail on the merits. The Court

determines that Plaintiffs have not met their burden of showing Defendants'

noncompliance with NFMA and NEPA. Thus, it does not consider Defendants'

procedural argument.

As relevant to Plaintiffs' argument, NFMA requires that the Project be

consistent with the Forest Plan. 16 U.S.C. § 1604(1). Plaintiff argues that the

Project violates NFMA because USFS arbitrarily and capriciously authorized the

Project despite its failure to show compliance with the Forest Plan Riparian

Management Objectives and Riparian Conservation Area standard. Plaintiffs

allege two specific defaults: (1) that USFS did not evaluate the condition of each

stream within the Project area according to the Forest Plan's standards; and (2)

that USFS unlawfully failed to disclose the numeric total maximum daily load for

sediment in Petersen Creek, which is found within the Project area. Defendants

claim that because the Project presents no threat to riparian areas, no further

analysis or disclosure was necessary.

The relevant conservation standard is that "activities in [Riparian

Conservation Areas] shall . . . enhance, restore or maintain" the area. (FS

017662.) Activities that do not meet specific riparian objectives must "include a

restoration component . . . which trends towards accomplishing desired stream

function[.]" (FS 017662.) USFS did not authorize any timber cutting in riparian

areas. In fact, the only actions within the riparian areas are restorative in nature—culvert replacement, road decommissioning, livestock fencing, and large woody debris replacement. (FS 002132–41, 002905–13.)   USFS specifically intended for every action taken within riparian areas to benefit those areas, determining that the Project would likely improve water conditions. (FS 002203–05, 002321.)

Plaintiffs argue that the Project EIS contains insufficient information for them to agree that Project actions within riparian areas will indeed be beneficial. However, they have not pointed to any data suggesting that the proposed activities could possibly threaten the water systems within the Project area. In the absence of any evidence that the Project could harm riparian habitat, the Court cannot determine that the Project is inconsistent with the Forest Plan and therefore in violation of NFMA.

Plaintiffs present essentially the same arguments regarding alleged violations of NEPA. Plaintiffs have submitted limited argument regarding NEPA, but their claim is ultimately that USFS was obligated to disclose more information than it did regarding the effects of proposed actions on riparian areas. In response, Defendants point to specific passages within the EIS describing detailed findings regarding water conditions within the Project area. (*See* FS 002158–65,

002282–83, 002293, 2156–65, 002282–83, 002055–66, 002156–64, 002169–70, 000204–05, 000022–25, 000084, 002321.)

NEPA exists to inform agency decision-makers and the public about the environmental consequences of proposed federal actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Its requirements are "essentially procedural." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978). Under NEPA, an agency must prepare an EIS before taking any "major Federal action significantly affecting the environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11. In reviewing the EIS, a court is limited to determining whether the agency took a "hard look" at the proposed action's environmental consequences. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992).

There is no NEPA violation here. The Court is satisfied that USFS took the requisite hard look at the Project's potential impact on riparian areas. USFS has provided substantial citations to the EIS, pinpointing its specific findings about the likely consequences of the proposed action on water conditions within the Project area. The EIS demonstrates USFS's careful consideration of the Project's environmental impact, and that is all that NEPA requires.

Plaintiffs also devote one paragraph to arguing that USFS violated NFMA

by failing to disclose Petersen's total maximum daily load for sediment within the EIS. However, the EIS does in fact state that a total maximum daily load has been developed for Petersen Creek. (FS 002153.) It also sets forth USFS's commitment to consideration of that limit and cites to the Montana Department of Environmental Quality's website for the specific limit. (FS 002160, 002184–88, 002324.) While the Court notes that a failure to disclose this information would more appropriately give rise to a claim under NEPA than NFMA, it finds that no violation occurred under either Act because no failure to disclose occurred.

Finally, Plaintiffs argue that USFS violated both NFMA and NEPA by not requiring the closure of all unauthorized roads within the Project area. This argument fails because it is based in a misrepresentation of the relevant Forest Plan standard. Plaintiffs claim that the Forest Plan mandates closure of all unauthorized motorized routes. However, the standard clearly requires USFS only to restrict travel to routes that have either been "designated through site specific travel planning" or, if such routes have not been designated, "identified on the Forest Plan Interim Roads and Trails Inventory GIS Layer." (FS 017676.) The Inventory includes the unauthorized motorized routes within the Project area. (FS 017697; *See also* FS 000837–38, 002410, 018202–03.) Thus, the Project EIS is consistent with the Forest Plan, and USFS could not have violated NFMA by

-26-

failing to close all unauthorized routes within the Project area. Additionally, there is no claim under NEPA because Plaintiffs have not argued that Defendants failed to comply with its disclosure requirements.

Federal Defendants are entitled to summary judgment on Plaintiffs' claims for violations of NFMA and NEPA.

According, IT IS ORDERED that:

(1)     Plaintiffs' Motion for Summary Judgment (Doc. 18) is DENIED.

(2)     Defendants' Motion for Summary Judgment (Doc. 27) is GRANTED.

(3)     Plaintiffs' Motion for Preliminary Injunction (Doc. 34) is DENIED as moot.

(4)     The Clerk of Court shall enter judgment in favor of Defendants and shall CLOSE this case.

Dated this 14th day of July, 2016.

Dana L. Christensen, Chief District Judge
United States District Court